UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

---

Exeter Hospital, Inc.                                    Docket No. 1:16-cv-

*Plaintiff*                                    JURY TRIAL DEMANDED

- *v.* -

American HealthCare Services Association, LLC

*Defendant*

---

# CIVIL COMPLAINT

## THE PARTIES

**PLAINTIFF:**

1.    Plaintiff Exeter Hospital, Inc. (hereinafter referred to as "Exeter Hospital") is a New Hampshire corporation, having a principal place of business of 5 Alumni Drive, Exeter, NH, 03833.

**DEFENDANT:**

2.    American HealthCare Services Association, LLC (hereinafter referred to as "AHSA") is a Michigan limited liability company, having a principal place of business located at 10126 E. Cherry Bend Road, Traverse City, MI 49684.

## JURISDICTION AND VENUE

3.      This civil action for statutory contribution involves a controversy between the citizens of different states.

4.      The amount in controversy exceeds the sum of $75,000.

5.      The United States District Court has original subject matter jurisdiction over this civil action, pursuant to 28 U.S.C. §1332.

6.      The defendant has transacted business in the State of New Hampshire by entering into a contract that was to be performed within the State.

7.      *In personam* jurisdiction over the non-resident defendant is obtained through New Hampshire RSA 510:4.

8.      A substantial part of the events or omissions giving rise to this claim occurred within the State of New Hampshire.

9.      Venue in the District of New Hampshire is proper, pursuant to 28 U.S.C. §1391 (b)(2).

## COMMON FACTUAL ALLEGATIONS

10.     This statutory contribution action arises out of the Hepatitis-C outbreak that occurred at Exeter Hospital.

11.     In May 2012, Exeter Hospital became aware that three of its former patients had been diagnosed with Hepatitis-C.

12.     Due to common elements in their clinical histories, Exeter Hospital reported the cases to the New Hampshire Department of Health and Human Services Division of Public Health Services (hereinafter referred to as "DPHS").

13.   Testing performed by the DPHS confirmed that all three of those cases shared an identical strain of Hepatitis-C, indicating that the patients had a common source of infection.

14.   The connection among the infected individuals appeared to involve the Exeter Hospital's Cardiac Catheterization Lab (hereinafter referred to as "the Cath Lab").

15.   Subsequently, a Cath Lab technician, defendant Kwiatkowski, was determined to be infected with the same Hepatitis-C strain as that found in the three Cath Lab patients, and as a result, he was identified as being the potential source of the patient infections.

16.   Kwiatkowski was immediately placed on leave and was later terminated.

17.   During the investigation, Exeter Hospital and the DPHS attempted to contact all patients who had received care in the Cath Lab and other designated areas of the hospital, and recommended that they undergo testing for the Hepatitis-C virus.  As result of that effort, more than 3,000 patients were tested.

18.   Of the patients who underwent testing, a total of thirty-two tested positive for the same strain of the Hepatitis-C virus associated with Kwiatkowski.

19.   In June 2013, a thirty-third individual reportedly tested positive for Kwiatkowski's Hepatitis C strain which the individual contracted through contact with one of the Exeter Hospital patients infected by Kwiatkowski.

20.   Kwiatkowski was arrested on or about 19 July 2012 and charged with multiple federal felonies including: (1) acquiring controlled drugs by misrepresentation, fraud, forgery, deception or subterfuge; and (2) tampering with a consumer product and the container for such product that affected interstate and foreign commerce with reckless disregard for the risk that another person will be placed in danger of death or bodily injury and under

circumstances manifesting extreme indifference to such risk, resulting in serious bodily injury to another individual.

21. On 28 November 2012, a federal grand jury indicted Kwiatkowski on seven counts each of fraudulently obtaining controlled drugs, and tampering with a consumer product.

22. According to federal criminal charges filed against him, Kwiatkowski surreptitiously stole syringes containing narcotic medications, including fentanyl, that were intended for hospital patients.  The stolen narcotic-filled syringes and were replaced with saline-filled syringes that Kwiatkowski had previously used to inject himself, and which were contaminated with his blood.

23. Kwiatkowski engaged in this pattern of illegal drug diversion and use over a period of years, at numerous hospitals across the country, even though he knew he was infected with Hepatitis-C.

24. Law enforcement officials have described Kwiatkowski as a "serial infector" who acted with "extreme indifference" for public safety.

25. As a nationally registered traveling technician, Kwiatkowski worked at an estimated nineteen hospitals in eight states between 2003 and 2012, where he potentially could have infected thousands of patients with Hepatitis-C.

26. Between 2003 and 2007, Kwiatkowski was terminated and/or resigned from four Michigan health facilities.  Three of these terminations and/or resignations were related to investigations about or findings of controlled drug use.

27. In 2004, Kwiatkowski resigned from St. Joseph Mercy Health System after he was questioned about a toilet that was overflowing with syringes.  He admitted a co-worker

was leaving syringes of Dilaudid for him in empty rooms which he was using, and he tested positive for controlled substances.

28.    Thereafter, also in 2004, Kwiatkowski was terminated from William Beaumont Hospital for "gross misconduct."

29.    In 2006, Kwiatkowski resigned from the University of Michigan Hospital after being suspended in the midst of an investigation related to missing controlled substances, including fentanyl.   During the investigation Mr. Kwiatkowski was questioned in connection with three incidents of vials or syringes of Fentanyl being stolen on 21 September, 10 October, and 7 December 2006.   In 2007, Kwiatkowski resigned from Oakwood Annapolis Hospital after he was suspended pending an investigation regarding potential controlled substance use.

30.    Between 2007 and 2011, Kwiatkowski accepted positions at health facilities in New York, Pennsylvania, Maryland, Arizona, Kansas, Georgia, and New Hampshire.

31.    In 2008, Kwiatkowski was terminated from the University of Pittsburgh Medical Center Presbyterian Shadyside (hereinafter referred to as "UPMC") after another employee witnessed Kwiatkowski remove a syringe of fentanyl from an operating room.  During a search, three (3) empty Fentanyl syringes were found on David Kwiatkowski and an empty morphine syringe was found in his locker.

32.    David Kwiatkowski was seen in the Emergency Department where a comprehensive drug screen was ordered which confirmed the presence of Fentanyl and Opiates. Subsequent testing of a syringe from the procedure room where Kwiatkowski was observed stealing a syringe confirmed that Kwiatkowski had replaced the syringe of fentanyl with a syringe containing another fluid.

33.   Less than two weeks after being terminated by UPMC, Kwiatkowski accepted a position at the Baltimore Veterans Affairs Medical Center (hereinafter referred to as "VA Medical Center").

34.   To date, in addition to the thirty-three Exeter Hospital patients and additional individuals who have tested positive for Hepatitis-C and been linked to Kwiatkowski, fourteen patients in four states reportedly have been diagnosed with the same Hepatitis C strain. One patient at UPMC has been diagnosed with a matching strain. Additionally, one patient at the VA Medical Center has been diagnosed with Hepatitis C linked to Kwiatkowski. Six patients at The Johns Hopkins Hospital in Baltimore, where Kwiatkowski worked in 2009 and 2010, have also been diagnosed with the relevant strain of Hepatitis C. Six patients who were treated at Hays Medical Center in Kansas, where Kwiatkowski worked in 2010 have also tested positive for Hepatitis-C linked to Kwiatkowski.

35.   Medical records obtained by the U.S. Attorney's Office as part of the criminal investigation indicate that Kwiatkowski tested positive for Hepatitis-C in June of 2010.

36.   Despite knowing he had Hepatitis-C, Kwiatkowski continued to expose hospital patients to the potential risk of contracting the virus for years before Triage recommended him for employment at Exeter Hospital.

37.   Kwiatkowski has a history of telling false stories about himself to employees at the hospitals where he has worked. For example, Kwiatkowski frequently claimed to have played baseball at the University of Michigan and that his fiancée died under tragic circumstances. A supervisor from a hospital in another state indicated that Kwiatkowski was terminated for falsifying timesheet information.

38. Multiple witnesses have stated that Kwiatkowski told them he suffered from cancer, which cannot be corroborated by any medical documentation.   When police interviewed him in July of 2012, he admitted he had "fabricated his life."   When asked how patients at Exeter Hospital may have contracted Hepatitis-C, Kwiatkowski told the police, "You know, I'm more concerned about myself, my own well-being.  I've learned here to just worry about myself, and that's all I really care about now."

39. On 14 August 2013 Kwiatkowski appeared in the United States District Court for the District of New Hampshire and, as part of a plea agreement reached with the United States Attorneys for the Districts of New Hampshire, Kansas, Maryland and the Middle District of Georgia, Kwiatkowski admitted to his criminal conduct and pleaded guilty to all 14 counts of the Indictment, as well as one count of tampering with a consumer product and one count of obtaining controlled substances by fraud for events occurring in the District of Kansas.

40. At all times relevant to this litigation, Kwiatkowski had a duty to exercise reasonable care to prevent the patients with whom he came into contact, including the patients of Exeter Hospital, from contracting the Hepatitis-C virus, of which he was a carrier.

41. In total disregard of the aforesaid duty, Kwiatkowski negligently infected thirty-two (32) Exeter Hospital patients with the Hepatitis-C virus.

42. Prior to the time that Kwiatkowski came to work at Exeter Hospital, he had been fired from at least four different hospitals.

43. Although UPMC immediately terminated him in 2008, Kwiatkowski remained employed as a traveling cardiac catheterization technician, thereby foreseeably placing at risk the

patients at any hospital in the country to which Kwiatkowski might travel, including those at Exeter Hospital.

44. Maxim Healthcare Services, Inc. d/b/a Maxim Staffing Solutions (hereinafter referred to as "Maxim") is a Maryland corporation, having a principal place of business located at 7227 Lee DeForest Drive, Columbia, MD 21046. Upon information and belief, it has an office at 1750 Elm St., Suite 602, Manchester, NH 03104 and is registered to do business in NH.

45. Maxim is a temporary hospital staffing agency and was responsible for placing Kwiatkowski at UPMC.

46. Maxim was notified of the UPMC termination, but failed to report Kwiatkowski to any law enforcement agency or licensing authority.

47. Recognizing the obvious importance of making such a report, Maxim created and back-dated an e-mail message suggesting that it had reported Kwiatkowski's conduct to the Maryland Board of Physicians in 2009.

48. Maxim has subsequently admitted (through counsel) to the Maryland Attorney General's Office that the e-mail message was a fabrication.

49. Maxim's inaction enabled Kwiatkowski to remain employed as a traveling cardiac catheterization technician, thereby foreseeably placing at risk the patients at any hospital in the country to which Kwiatkowski might travel, including those at Exeter Hospital.

50. Despite his recent termination from UPMC, Maxim placed Mr. Kwiatkowski in a position at Southern Maryland Hospital in November 2008. He was terminated in February 2009 for falsifying and forging his supervisor's signature on his time records.

51.     In July 2009, the staffing agency, Medical Solutions, placed Mr. Kwiatkowski in a position at Johns Hopkins Hospital.  After Johns Hopkins extended an offer of permanent employment to Mr. Kwiatkowski the offer was revoked shortly after two incidents in which vials of Fentanyl went missing from the department where Kwiatkowski worked.

52.     In March of 2010, while working at the Arizona Heart Hospital in Phoenix, Arizona, Kwiatkowski was reportedly found semi-conscious in a restroom stall.  The co-employee who discovered him observed a fentanyl syringe floating in the toilet.

53.     Kwiatkowski admitted to an Arizona Heart Hospital employee that he had taken a syringe filled with fentanyl and injected himself.

54.     A drug test was administered and detected the presence of marijuana and cocaine in Kwiatkowski's system.   The drug test administered did not specifically screen for fentanyl.

55.     After failing the drug test, Kwiatkowski was terminated immediately by the hospital.

56.     The temporary medical staffing agency that had placed Kwiatkowski at Arizona Heart Hospital, SpringBoard, Inc., also terminated Kwiatkowski's employment, and notified defendant ARRT of the circumstances of Kwiatkowski's termination.

57.     Although ARRT had actual notice of the Arizona Heart Hospital termination, ARRT took no meaningful action to investigate the incident and/or revoke Kwiatkowski's national certification.

58.     As the operator of a national registry of radiological technicians, ARRT had the ability to investigate, suspend or revoke Kwiatkowski's national certification.

59.     ARRT did not act on Arizona Heart Hospital's report of Kwiatkowski's misconduct, but instead, continued to maintain his ARRT certification.

60.     ARRT's inaction enabled Kwiatkowski to remain employed as a traveling cardiac catheterization technician, thereby foreseeably placing at risk the patients at any hospital in the country to which Kwiatkowski might travel, including those at Exeter Hospital.

61.     The staffing agency, Medical Solutions, placed Mr. Kwiatkowski at Hays Medical Center in Kansas in May, 2010.  He was terminated on September 22, 2010 after being caught falsifying his time sheets and forging the signature of his supervisor.

62.     Like hundreds of health care facilities around the country, Exeter Hospital relies on third-party staffing agencies to identify and screen potential medical personnel to fill short-term staffing vacancies.

63.     Exeter Hospital is a member of the defendant, American HealthCare Services Association, LLC (hereinafter referred to as "AHSA").

64.     AHSA holds itself out as the largest hospital vendor management association in the United States.

65.     ASHA contracts with various agencies to provide temporary staffing services to its member hospitals.

66.     Exeter Hospital's reliance on AHSA to contract with competent staffing agencies, and on Triage to properly screen Kwiatkowski was consistent with national standards for proper hospital operations and was entirely reasonable.

67.     Prior to Kwiatkowski's arrival at Exeter Hospital, AHSA had entered into a staffing agreement with defendant Triage for Triage to provide temporary staffing to its member hospitals.

68.     At all times relevant to this litigation, AHSA owed a duty to Exeter Hospital to exercise reasonable care to monitor Triage, to ensure that Triage and their staff remained in

compliance with the terms of the staffing agreement, and to ensure that Triage and their staff conformed to internal and third-party quality assurance standards to which Triage claimed it adhered.

69.     In total disregard of its duty, AHSA failed to properly monitor the performance and compliance of Triage.

70.     ASHA's conduct was in violation of RSA Chapter 358-A, the New Hampshire Consumer Protection Act, in that ASHA represented that its services were of a particular standard, quality and grade, when in fact, they were of another.  See RSA 358-A:2.

71.     ASHA's conduct was in violation of its common law implied duty to act in good faith throughout the performance of its contractual obligations to Exeter Hospital.

72.     AHSA's conduct foreseeably placed at risk the patients at any hospital in the country to which Kwiatkowski might travel, including those at Exeter Hospital.

73.     The aforesaid breach of duty by AHSA resulted in Kwiatkowski being placed at Exeter Hospital, notwithstanding the fact that he was addicted to opioids; was infected with Hepatitis-C; and had resigned from or been terminated by at least four prior hospital positions as a direct result of his in-hospital drug-related misconduct.

74.     Pursuant to the AHSA staffing agreement, Kwiatkowski was referred to Exeter Hospital by Triage, and began work on or about 11 April 2011.  He became a permanent employee of Exeter Hospital on 17 October 2011.

75.     Triage advertises itself as "a company you can trust" with "over 25 years of staffing experience."  Triage represents that its "goal is to provide your facility with a healthcare professional  whose  personality  and  technical  abilities  match  the  needs  of  your

department.  Our healthcare professionals carry all the necessary licensures, insurance and certifications necessary, and will meet any and all hospital and JCAHO protocols."

76.     Triage further represents that it "provides recruiting, screening, verification and assessment for "best fit" personalities.   [Triage] adheres to a strict process of interviewing, establishing credibility, and assuring competency before placing [its] healthcare professionals.  Each Triage employee is drug tested and has a background check completed to give [Triage's clients] complete peace of mind."

77.     Triage had obtained the Joint Commission's Health Care Staffing Certification. This certification "assures customers, staff and other stakeholders that [a] staffing agency is fully meeting the health care quality and safety needs for which [a staffing agency] is responsible."

78.     Triage failed to meet its contractual obligations to the AHSA; failed to meet its own published standards; failed to meet the standards imposed by the JCAHO; and failed to meet the guarantees that it provided Exeter Hospital by recommending Kwiatkowski for a temporary staff position in Exeter Hospital's Cardiac Cath Lab.

79.     Triage's conduct was in violation of RSA Chapter 358-A, the New Hampshire Consumer Protection Act, in that Triage represented that its services were of a particular standard, quality and grade, when in fact, they were of another.  See RSA 358-A:2.

80.     Triage's conduct was in violation of its common law implied duty to act in good faith throughout the performance of its contractual obligations to Exeter Hospital.

81.     Triage's conduct foreseeably placed at risk the patients at any hospital in the country to which Kwiatkowski might travel, including those at Exeter Hospital.

82. The aforesaid breaches by Triage resulted in Kwiatkowski being placed at Exeter Hospital, notwithstanding the fact that he was addicted to opioids; was infected with Hepatitis-C; and had resigned from or been terminated from at least  four prior hospital positions as a direct result of his drug-related misconduct.

83. Prior to the time that Kwiatkowski arrived at Exeter Hospital, AHSA knew, or through the exercise of reasonable care, should have known, that Kwiatkowski was unfit for continued employment as a traveling cardiac catheterization technician.

84. Prior to the time that Kwiatkowski arrived at Exeter Hospital, AHSA knew, or through the exercise of reasonable care, should have known, that allowing Kwiatkowski to continue working as a traveling cardiac catheterization technician would foreseeably place at extreme risk any patient who came under his care.

85. AHSA owed a duty to exercise reasonable care to properly screen, test, monitor and supervise Kwiatkowski in his capacity as a traveling cardiac catheterization technician.

86. AHSA owed a duty to exercise reasonable care to fully investigate and report to the appropriate authorities Kwiatkowski's illegal drug diversion and use.

87. AHSA owed a duty to immediately and permanently prevent Kwiatkowski from continuing his employment as a traveling cardiac catheterization technician.

88. In complete disregard of the aforesaid duties, AHSA failed and neglected to discharge their duty to properly screen, test, monitor and supervise Kwiatkowski.

89. In complete disregard of the aforesaid duties, AHSA failed and neglected to discharge their duty to fully investigate and report to the appropriate authorities Kwiatkowski's illegal drug diversion and use.

90.   In complete disregard of the aforesaid duties, AHSA failed and neglected to discharge their duty to immediately and permanently prevent Kwiatkowski from continuing his employment as a traveling cardiac catheterization technician.

91.   Given the itinerant and temporary nature of Kwiatkowski's employment in the medical field, a fact that was known to AHSA, AHSA's failure to discharge the aforesaid duties foreseeably placed at great risk any patient with whom Kwiatkowski might come into contact, including patients of Exeter Hospital.

92.   As a direct and proximate result of the aforesaid breaches of duty by AHSA, Exeter Hospital and its patients were foreseeably harmed within the State of New Hampshire.

## COUNT 1 – STATUTORY CONTRIBUTION
## PATIENTS N001 THROUGH N188 SETTLEMENTS

93.   The allegations set forth in Paragraphs 1 through 92 are re-alleged for the purpose of this count.

94.   Patients N001 through N188[1] were among the more than 3,000 Exeter Hospital patients who underwent the Hepatitis-C testing recommended by Exeter Hospital and the New Hampshire Department of Health and Human Services.

95.   Patients N001 through N188 each tested negative for the Hepatitis-C virus.

96.   Although Patients N001 through N188 tested negative for the virus, they presented claims for damages to Exeter Hospital, alleging that they each suffered diverse physical and emotional injuries as a direct result of learning of their potential infection with the Hepatitis-C virus; of having to undergo the recommended Hepatitis-C testing (which

---

[1] Because none of the patients who tested negative ever filed a lawsuit, the identities of all settling negative claimants remain confidential.  Consequently, each of the settling negative claimants has been identified herein with a pseudonym.  A listing of the pseudonyms and the corresponding patient names will be provided to opposing counsel.

included needle punctures of their veins); and of having to wait for days (or in some cases, weeks) before learning that their test results were negative.

97.   Following an investigation by Exeter Hospital, the claims of Patients N001 through N188 were settled through pre-suit negotiation with the patients' legal counsel.

98.   The claims of Patients N001 through N188 were settled in three distinct clusters.

99.   The claims of Patients N001 through N011 were settled on or about 25 November 2015 for a confidential aggregate amount that was agreed to by each of those patients.

100.  The settlement was paid to Patients N001 through N011 on or about 19 January 2016.

101.  The claims of Patients N012 through N050 were settled on or about 7 May 2015 for a confidential aggregate amount that was agreed to by each of those patients.

102.  The settlement was paid to Patients N012 through N050 on or about 20 October 2015.

103.  The claims of Patients N051 through N188 were settled on or about 9 May 2015 for a confidential aggregate amount that was agreed to by each of those patients.

104.  Most of the settlement was paid to Patients N051 through N188 on or about 21 December 2015, although a small amount of the settlement was held back, pending the return of executed releases from a few of the patients.

105.  In connection with the settlement of the claims of Patients N001 through N188, each patient was required to execute a general release of all claims which discharged the common liability of AHSA (and others).

106.  Counsel for Exeter Hospital has provided counsel for AHSA with the identities of Patients N001 through N188; disclosed the amount that was accepted by each patient in settlement of their claims; and furnished a copy of the general release executed by each patient in connection with the settlement.

107.    AHSA did not contribute to any of the settlements.

108.    The amount paid by Exeter Hospital to settle the claims of Patients N001 through N188 and discharge the common liability of AHSA was disproportionate to Exeter Hospital's actual responsibility for the Hepatitis-C outbreak.

109.    Pursuant to RSA 507:7 (e), (f), and (g), Exeter Hospital is entitled to have the proportionate fault of the AHSA established, and to be awarded statutory contribution from AHSA in an amount that is commensurate with that apportionment.

110.    Exeter Hospital seeks an award of statutory contribution in an amount that is in excess of the minimum jurisdictional limits of the United States District Court, plus interest and taxable costs.

111.    In addition, Exeter Hospital seeks an award of all attorneys' fees reasonably incurred in the prosecution of this contribution action.  See *Harkeem v. Adams*, 117 N.H. 687, 377 A.2d 617 (1977).

## JURY TRIAL DEMANDED

112.    A jury trial is demanded.

Respectfully submitted,

**Exeter Hospital, Inc.**

By its attorneys,

Devine, Millimet & Branch
Professional Association

Dated:  6 May 2016                    /s/ Robert C. Dewhirst
                                      _____
                                      Robert C. Dewhirst, Esquire, NHBA #634
                                      Elaine M. Michaud, Esquire, NHBA #10030
                                      Peter W. Mosseau, Esquire, NHBA #1817
                                      Jonathan A. Lax, Esquire, NHBA #14017
                                      111 Amherst Street
                                      Manchester, NH  03101
                                      (603) 669-1000
                                      rdewhirst@devinemillimet.com
                                      emichaud@devinemillimet.com
                                      pmosseau@devinemillimet.com
                                      jlax@devinemillimet.com